## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CATHERINE BEARDSLEY,

    *Plaintiff*,

    v.

HARTFORD FIRE INSURANCE CO.,

    *Defendant*.

No. 3:18cv2056 (MPS)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Catherine Beardsley ("Plaintiff") brings this action against Hartford Fire Insurance Company ("The Hartford") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, alleging it improperly terminated her life insurance premium waiver benefits. (ECF No. 1 ¶2.) The parties have filed cross motions for summary judgment. (ECF Nos. 25, 27.) For the reasons set forth below, I find The Hartford's termination was not arbitrary and capricious; consequently, the Plaintiff's motion is DENIED and The Hartford's motion is GRANTED.

## I.      BACKGROUND

The following relevant facts are taken from the parties' Local Rule 56(a) Statements and the Administrative Record ("AR") and are undisputed unless otherwise indicated.

The Plaintiff was employed by The Hartford as an auto claims processor. (AR 30.[1]) She was covered under a long-term disability plan ("LTD Plan") and a group life insurance plan ("Life Plan"), group welfare benefit plans established and/or maintained by The Hartford. (ECF No. 1 ¶ 1.)

---

[1] Citations to the administrative record refer to the Bates page number located in the bottom right hand corner of the page and labeled "Beardsley v. Hartford." See ECF No. 24-1.

In 2009, the Plaintiff was involved in a car accident. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 11; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 11.)  As a result of injuries she sustained from the accident, she began receiving LTD benefits under the LTD plan in December 2010.  (AR 34.)

**LTD**

The LTD plan defined "Disabled" as the inability to perform one or more of the "Essential Duties of your Occupation" during an initial period of disability.  (AR 95.)  After the initial period of disability, the definition under the LTD plan required that a claimant be "prevented from performing one or more of the Essential Duties of Any Occupation."  (AR 268.)  "Any occupation" is defined as an occupation

> 1) for which You are qualified by education, training or experience; and
> 2) that has an earnings potential greater than an amount equal to the lesser of:
> > a. product of Your pre-disability Earnings and the Benefit Percentage for which You are enrolled and
> > b. the Maximum [M]onthly Benefit shown in the Schedule of Benefits.

(ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 8; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 8; AR 268).  Under the LTD definition of "Any Occupation," a claimant could receive benefits even if the claimant has full or part-time work capacity if (1) the claimant is unable to perform an occupation for which the claimant is currently qualified, or (2) the claimant is able to perform an occupation but the earnings potential of the occupation does not meet the specified minimum threshold.  (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 9; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 9.)

**Group Life Waiver of Premium Provision**

Effective March 29, 2011, The Hartford approved the Plaintiff's claim for life insurance waiver of the premium benefits ("LWOP").  (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 12; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 12; AR 69.)  This meant that her Group

Life Basic and Supplemental Life Insurance would remain in effect without premium payment, provided she remained totally disabled as defined by the Life Plan. (AR 69.) The Life Plan provides that life insurance premiums are waived if the claimant is "Disabled:"

> **Waiver of Premium** is a provision which allows for continued employee life insurance, without payment of premium, while You are Disabled. . . .
>
> **Disabled** means that:
> (1) You have a condition that prevents You from doing any work for which You are or could become qualified by education, training or experience and it is expected that this condition will last for at least six consecutive months from Your last day of work as a Salaried Employee or a Regular Part-time Employee; or
> (2) You have been diagnosed with a life expectancy of 12 months or less.

(ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 5, 6; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 5,6; AR 47.) To be eligible for Waiver of Premium benefits, a claimant must be disabled "from any work which includes part time sedentary unskilled labor." (AR 77; AR 47 ("'any work'" is characterized as the "physical and mental capacity to perform at least sedentary level work on a part-time basis and does not mean substantial gainful work on a full-time basis.").) The Life Plan provides that The Hartford "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions . . . ." (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 7; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 7; AR 1767).

**Plaintiff's Initial Treatment**

The Plaintiff's providers initially treated her symptoms with pain medications and epidural injections, which occasionally provided some limited relief for her back pain. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 14; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 14.) After approximately a year and half of unsuccessful conservative treatment, on July 27, 2011, the Plaintiff underwent a total disc replacement at L5-S1. But this did little to alleviate her back pain.

(ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 15; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 15.)

**2013**

On January 7, 2013, the Social Security Administration ("SSA") determined that the Plaintiff was eligible to receive Social Security Disability Income, finding that "the claimant has been disabled from July 18, 2010, through the date of this decision." (AR 209-218.) In its Notice of Decision, the Social Security Administration found that the Plaintiff "has the residual functional capacity to perform sedentary work …, except that she requires daily unscheduled work breaks of indefinite duration and therefore cannot sustain work on a regular basis." (AR 215.)

On March 20, 2013, the Plaintiff had a total disc replacement at L4-5. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 18; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 18.) The surgery was successful, and in June 2013, Plaintiff told her orthopedic surgeon, Dr. Charles Kime, that she had only "mild" low back pain. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 19; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 19; AR 1211). Dr. Kime observed that the Plaintiff still had "left leg pain especially in the buttock" and was taking Norco.[2] (AR 1211.) Dr. Kime opined that the Plaintiff had "some neuropathic changes in the left lower extremity" that he would monitor. (AR 1478.)

The Plaintiff continued to report left leg pain when seen next in October 2013. (AR 1210.) Upon examination, Dr. Kime noted the Plaintiff was "comfortable at rest." (AR 1210.) He prescribed Neurontin[3] and told her to follow up in 6 months. (AR 1210.)

---

[2] Norco refers to Hydrocodone-Acetaminophen, a medication used to treat pain. https://www.webmd.com/drugs/2/drug-63/norco-oral/details.

[3] Neurontin, also referred to as Gabapentin, is used to relieve nerve pain. https://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-oral/details.

**2014**

On April 1, 2014, Dr. Kime noted that the Plaintiff reported that she takes Neurontin 100 mg and "has some improvement with this." (AR 1209.) The Plaintiff stated that she "has episodes of falling twice a month and has left leg pain." (AR 1209.) Upon examination, she was "comfortable at rest." (AR 1209.) Under "assessment," Dr. Kime stated "Stable postoperative course with continued moderate symptoms." He refilled the prescription for Neurontin and instructed the Plaintiff to follow up as needed. (AR 1209.)

On July 29, 2014, Dr. Kime reported that the Plaintiff "complains of continued problems with falling "because of numbness in her left foot." (AR 1207.) The Plaintiff indicated that she was taking Neurontin 200 twice a day but it was not helpful. She occasionally used a cane. Dr. Kime noted that the Plaintiff "has had chronic symptoms since before the surgery since a motor vehicle accident. EMG in 2012 was normal. Postop MRI was normal." (*Id.*) He observed that she might have difficulties with proprioception and/or sensory changes due to chronic neuropathy and recommended that she try "balance training and proprioceptive training and therapy." He prescribed Neurontin 300 three times a day. (*Id.*)

On December 22, 2014, Dr. Kime observed that the Plaintiff "continues to complain of issues with balance and giving way. Most of her pain is in the left leg. Overall she notes that her low back pain is much improved compared to preoperatively." (AR 1205.) Her quadriceps and tibialis anterior motor strength was 5/5 (normal) and her straight leg raise test was negative. (AR 1205.) The Plaintiff's xrays indicated "excellent maintained alignment and position of ProDisc replacement at L4-5 and L5-S1." (AR 1205.) Dr. Kime's assessment was "balance issues of unknown etiology" and recommended that she be evaluated by a neurologist.

**2015**

In a January 2015 questionnaire for The Hartford, the Plaintiff stated that she had back pain

and "numbness in left leg, and both feet." (AR 1253.)

On May 14, 2015, the Plaintiff was seen by Dr. Conway, a neurologist. (AR 1190.) She reported that she had left leg pain that was "aching" and "numbness of the feet that she associated with "'pins and needles' sensations." (AR 1190.) She told Dr. Conway that her left leg periodically gave out and the pain in the left leg sometimes radiated to the buttocks. She was taking hydrocodone and gabapentin. Dr. Conway stated that the Plaintiff's "examination was essentially normal aside from a slight diminution to pin over the top of the left foot." (AR 1192.) He assessed her lumbar MRI imaging as "relatively unremarkable revealing a possible tear of the L4-5 disc in 2012 and a central disc protrusion at L4-5 in 2010 causing only mild central stenosis. There is thus no clear physiologic explanation for her symptoms. Further electromyography of the legs in 2012 was normal." (AR 1192.) He ordered bloodwork, the results of which were normal. (AR 1197.)

Dr. Conway saw the Plaintiff again on June 11, 2015. The Plaintiff continued to complain of back and left leg pain and intermittent tingling in her feet. (AR 1187.) She described the pain as "constant" and "worse in certain positions such as standing and sitting." (AR 1187.) Her neurologic examination was nonfocal and revealed no evidence of segmental reflexes or motor loss. (AR 1189.) The nerve conduction test of the lower extremities was normal, revealing no evidence of a lumbar radiculopathy. (AR 1187, 1199.) There was no electrodiagnostic evidence of a peripheral neuropathy or right or left lower extremity radiculopathy, plexopathy or mononeuropathy. (AR 1199.) Her gait was normal, though slightly antalgic. (AR 1189.) She had reduced pin sensation over the dorsum of her left foot. (AR 1189.) Because she appeared to be in pain, he ordered repeat lumbar MRI imaging. (AR 1189.)

In June 2015, the Plaintiff had a thoracic MRI, which indicated a focal left lateral disc protrusion at T11-T12 with mild mass effect upon the left T12 nerve root. (AR 1196.) There was no central canal stenosis or foraminal narrowing. (AR 1196.)

In July 2015, she had a lumbar MRI, which indicated (1) disc prostheses at L4-L5 and L5-S1 distorting anatomy and limiting assessment due to suspectibility artifacts and (2) stable left lateral disc protrusion and small left paracentral disc protrusion at T11-T12 and T12-L1, respectively. (AR 1195.)

In an October 19, 2015 report, Dr. Kime stated the Plaintiff "continues to have chronic problems with balance and complains of falling chronically." (AR 1203.) He observed that "MRI reports indicate the presence of a left T11-12 protrusion with minimal deformity. L3-4 is normal. L4 to S1 show evidence of previous surgery." (AR 1203.) Based on surgeries, he assessed her with having a 28% permanent partial impairment as a result of her 2009 motor vehicle accident. (AR 1203.) His plan was to followup as needed. (AR 1203.)

**2016**

In a questionnaire dated March 23, 2016, the Plaintiff indicated that she was independent in her activities of daily living with the exception of putting on her bra. (AR 1223.) She indicated she had constant back pain and "pins and needles" in her feet. (AR 1223.) She said she "fall[s] frequently due to numbness in [her] legs and feet." (AR 1223.) She needs reminders to take her medications and her husband "has to be around when she cooks so she doesn't leave the stove on." She explained that she no longer goes to concerts or on long walks but does go out with friends so long as she doesn't have to stand. (AR 1223.)

In April 2016, Dr. Kime completed an Attending Physician's Statement indicating that he had last seen the Plaintiff on October 15, 2015. (AR 1200-01.) He indicated that she suffered from back pain, lumbar radiculophy, and had subjective symptoms of back and leg pain and

balance issues. (AR 1200.) Dr. Kime did not indicate any restrictions or limitations. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 38; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 38; AR 1200-1201.)

In July 2016, The Hartford referred the Plaintiff's claim to its Medical Case Management (MCM) unit for review. (AR 24.) A July 5, 2016 entry on The Hartford's claim log states that the Plaintiff was "still having pain and problems falling. Pain in left leg and foot with numbness, shooting pain in back down into buttock. Spouse bought her a dog to help with going up/down stairs." (AR 24.) The Plaintiff's claim was referred for peer review. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 41; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 41.)

Dr. Kenneth Bode, a board certified orthopedic surgeon, reviewed the Plaintiff's medical records from 2010 to 2016 and issued a report on August 5, 2016. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 42; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 42; AR 1149-1156.) Although Dr. Bode attempted to reach Dr. Kime on three occasions to discuss his findings, he was unsuccessful. (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶ 44; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶ 44.) Dr. Bode concluded that although the Plaintiff had some medically supported functional limitations, she retained the capacity to work "an eight hour day five days a week." (AR 1155.) Dr. Bode indicated that the Plaintiff had the capacity to constantly sit, fine manipulate, simple firm grasp and use lower extremities for foot controls; frequently stand, walk, reach at desk level, lift, carry, push and pull up to 10 pounds; and occasionally reach overhead and below waist, climb stairs, balance, stoop, kneel, crouch, lift, carry, push and pull up to 25 pounds. (AR 1155.) She was restricted from utilizing ladders and/or crawling. (AR 1155.) According to Dr. Bode, the Plaintiff

> has incapacitating diagnoses of facet syndrome, degenerative disc disease, and back pain, based on imaging on March 2, 2015. She also has prior sacroiliitis and greater trochanteric bursitis that would recur. She has co-morbid diagnoses of tobacco use

and moderate obesity, with a BMI of 35.85. She also has medical diagnoses that
would potentially worsen her prognosis, including anxiety, depression, asthma,
insomnia, mitral valve prolapse, pituitary prolactinoma, cellulitis, and a UTI . . . .

(AR 1155.)  He further opined that her "prognosis is poor, as she has multiple co-morbidities that

negatively affect her prognosis, and she is a not a surgical candidate. She is not expected to

improve and will have waxing and waning symptoms/complaints." (AR 1156.)

**Termination of LWOP**

By letter dated August 22, 2016, The Hartford notified the Plaintiff that it had determined

she no longer met the definition of "Disabled" under the Life Plan and therefore was no longer

eligible for Waiver of Premium benefits. (AR 73-78.) As grounds, The Hartford explained that it

had reviewed Dr. Kime's April 20, 2016 report, Dr. Kime's medical records, Dr. Conway's records,

the MRI reports, and Dr. Bode's report. (AR 76). The Hartford stated that based on its review of

the medical evidence, including the functional capability assessed by Dr. Bode, it had determined

that the Plaintiff was not "prevented from any work as indicated in the Policy definition of

Disabled."[4]  (AR 77.)

**2017**

In February 2017, the Plaintiff (represented by counsel) appealed The Hartford's decision.

(AR 220.)  The Plaintiff contended that the decision should be reversed because (1) it was at odds

with The Hartford's decision to pay the Plaintiff LTD benefits and the SSA's decision to award

disability benefits; (2) Plaintiff's treating physician, Dr. Kime, found she suffered from a

permanent impairment; (3) the Plaintiff takes "powerful" prescription medication, including

hydrocodone, gabapentin, and citalopram, that have "disabling side effects" and (4) the Plaintiff's

---

[4] The Hartford notified the Plaintiff that although she was no longer eligible for waiver of premium,
she could convert her employer-sponsored Group Life insurance to an individual life insurance
policy.

statements about her disabling symptoms were credible.  (AR 111, 220-221.)  In support, the

Plaintiff submitted an Activities of Daily Living questionnaire in which she stated that she is in

"constant debilitating pain" and falls frequently.  (AR 582.)   She also indicated she has "poor

sleep" and suffers from exhaustion as a result and submitted her FitBit reports.  (AR 198, 199-

200.)

In response, The Hartford referred the Plaintiff's file (but not Dr. Bode's report) for a second

peer review to Dr. Kevin Kohan, a physician board-certified in physical medicine and

rehabilitation and interventional pain medicine.  (AR 50, 176-182.)  In his March 16, 2017 report,

Dr. Kohan opined that there "is no evidence that the claimant experiences any functionally limiting

side effects from prescribed medications" and noted that "[n]o adverse side-effects are reported."

(AR 179.)  As to the Plaintiff's reports of her symptoms, Dr. Kohan found that her

> subjective reports are somewhat consistent with the clinical findings. Her reports
> of back pain and decreased functional ability prior to surgery is supported by
> imaging studies as well as examination findings. However, there is no clear
> physiologic explanation to support her current reports of lower extremity pain and
> numbness. Current imaging studies show no evidence of spinal cord involvement.
> Furthermore, EMG testing fails to reveal any abnormalities.

(AR 179.)  Dr. Kohan opined that the Plaintiff

> remains functionally limited primarily due to balance issues and difficulty with
> ambulation. She is restricted to walking up to 5 minutes at a time for a maximum
> of 1 hour per day and standing up to 15 minutes at a time for a maximum of 4 hours
> per day. Other activities are not affected. She is capable of sustaining work for 40
> hours per week. Her symptoms are exacerbated by activities involving frequent use
> of her lower extremities. Her symptoms are relieved by rest. There are no notable
> side-effects affecting the claimant's functional ability.

(AR 180.)  As to the Plaintiff's functional restrictions for the period of August 2016 through March

2017, Dr. Kohan stated:

> While there are no records for the time period in question, there is sufficient
> evidence demonstrating decreased functional ability due to the chronicity of the
> claimant's condition. Her lower extremity pain and impaired proprioception has
> been unchanged for years. Most recent evidence shows the claimant remains

10

> functionally limited in her ability to walk and balance. She is restricted to walking up to 5 minutes at a time for a maximum of 1 hour per day, standing up to 15 minutes at a time for a maximum of 4 hours per day, occasional climbing of stairs, and no climbing ladders. Her ability to sit, reach, lift, finger, and perform other activities is not affected. She is able to sustain full-time work with these restrictions.

(AR 180.)  In addition, Dr. Kohan stated that he had spoken to Dr. Conway, who indicated that he had not seen the Plaintiff "since June 2015, but back then, the claimant was certainly able to function at a sedentary level."  (AR 181.)

The Hartford thereafter conducted an Employability Analysis Report based on the functional capabilities ascribed to the Plaintiff by Dr. Kohan.  (AR 1108.)  The report, completed by a Rehabilitation Case Manager, specifically identified seven (7) sedentary and three (3) light occupations for which she is or could become qualified based on her education, training, and experience:  Claim Adjuster, Employment Interviewer, Mortgage Loan Interviewer, Financial Aid Counselor, Customer-Complaint Clerk, Teacher Aide, Surveillance System Monitor, General Clerk, Repair Order Clerk, and Appointment Clerk.  (AR 1110.)  Some of the positions were unskilled and semi-skilled.  (AR 51, 1110.)

**The Hartford's Denial of Plaintiff's Appeal**

On March 22, 2017, The Hartford notified the Plaintiff that in response to her appeal, it had reviewed her file and determined that the decision to terminate her claim for waiver of premium benefits was appropriate and that it was adhering to its decision.[5]  (AR 46.)  As grounds, The Hartford noted that according to Dr. Kime's records, the Plaintiff presented with complaints of chronic balance problems. Her MRI and EMG test results were negative. Dr. Kime noted that she had a 28% permanent partial disability rating and she was to follow-up on an as needed basis.

---

[5] Plaintiff asserts she did not receive the letter until several months later after counsel contacted The Hartford to inquire about the status of the claim.  (AR 126.)

The Plaintiff had not seen Dr. Kime since October 2015. The letter further notes that the Plaintiff last treated with Dr. Conway on June 11, 2015. At that visit, she reported continued back and leg pain. Dr. Conway's neurological examination was nonfocal and revealed no evidence of segmental reflexes or motor loss[,] with normal strength, coordination, gait, cranial nerves and proprioception. (AR 48.) In response to her submission of the Fitbit printout, The Hartford observed that it showed that with one exception, the Plaintiff slept over 7 hours per day during the period monitored. (AR 49.)

The Hartford also pointed to Dr. Bode's report in which he opined that the Plaintiff had some medically supported functional impairments, but possessed the capacity to work with certain enumerated restrictions. The Hartford observed that the restrictions recommended by Dr. Bode would indicate the Plaintiff possessed the functional capacity to perform at least part-time sedentary work. (AR 48.)

The Hartford explained that it had referred the Plaintiff's file to Dr. Kohan for a second independent physician review, and that he too opined that the Plaintiff retained the capacity to work with certain restrictions. (AR 50.) The Hartford concluded that "Drs. Conway, Bode and Kohan have all opined Ms. Beardsley possesses the capacity to perform at least full-time sedentary to light demand level work and Dr. Kime failed to provide an opinion regarding her functional abilities. Thus, there does not appear to be any physician supporting [the Plaintiff's] inability to work." (AR 50.)

The Hartford acknowledged that the Plaintiff was receiving SSA disability benefits but maintained that that determination (1) was made prior to the Plaintiff's March 2013 back surgery, which resulted in improvement in her symptoms, and not based on updated medical information and (2) was based on a different definition of disability. The Hartford explained that although it "considers the SSA disability determination as one piece of relevant evidence, the SSA

12

determination is not conclusive."  (AR 49-50.)  Similarly, The Hartford pointed out that the definition of disabled under the LTD plan differed from that governing the LWOP.  To be eligible for LTD, a claimant must be prevented from performing "Any Occupation" based on her functional abilities, education, training, and experience with wages that exceed the Policy's required earnings potential – which in the Plaintiff's case was $1539.90/month.  Such restrictions are not in the LWOP definition.  (AR 50.)

> Based on the evidence on file, The Hartford concluded that there was
>
> insufficient evidence to support your client's claim of Disability, as defined, from performing any work. Ms. Beardsley has alleged an inability to work due to chronic back pain; however, the totality of the medical information fails to substantiate the severity of her reported symptoms and total impairment. While it is appreciated and understood that she may in fact have some limitations to her activity, the weight of the evidence supports her capacity to perform "any work" within her limitations, such as the identified occupations.

(AR 51.)

In October 2017, The Hartford terminated the Plaintiff's LTD benefits.  In April 2018, the Plaintiff appealed and The Hartford reinstated her LTD benefits.  (ECF No. 1 at ¶¶ 29 - 31.)

In October 2018, the Plaintiff wrote to The Hartford again seeking reconsideration of its decision to terminate her LWOP.  In response, the Hartford informed the Plaintiff that its final appeal decision as to the termination of her LWOP was made on March 22, 2017, there was no provision for an additional appeal, and that she had exhausted the administrative remedies under the Plan.  (AR 43.)  This action followed.

## II.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted).  "In making that determination, a court must view the evidence in the light most favorable to the opposing party."

*Id.* (quotation marks omitted).  The court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc*., 715 F.3d 417, 427 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011).  Both parties in this case contend that there is no issue of material fact and that the Court should decide on the present record whether The Hartford properly terminated the Plaintiff's waiver of premium benefits.

## III.    ERISA STANDARD OF REVIEW

In an ERISA action, when "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," as they do in this case, the court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).  "Under the arbitrary and capricious standard, the scope of judicial review is narrow," *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (citations omitted), and "highly deferential."  *Arnone v. Aetna Life Ins. Co*., 860 F.3d 97, 106 (2d Cir. 2017).  The Court "may overturn an administrator's decision to deny ERISA benefits 'only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Hobson*, 574 F.3d at 83–84 (internal quotation marks and citations omitted)).  "Substantial evidence . . . is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance.'"  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks and alterations omitted).  The issue for the court is not whether the

defendant "made the correct decision but whether [it] had a reasonable basis for the decision that it made." *Hobson,* 574 F.3d at 89 (internal quotation marks and alterations omitted). *See Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator.") The Court must also determine "whether the decision was based on a consideration of the relevant factors." *Miller,* 72 F.3d at 1072. "In determining whether relevant factors were considered and substantial evidence relied upon in an ERISA eligibility determination, courts are limited to the reasons given at the time of the denial." *Diamond v. Reliance Standard Life Ins.*, 672 F.Supp.2d 530, 535 (S.D.N.Y. 2009) (internal quotation marks omitted).

## IV.    DISCUSSION

The Hartford asserts that there is substantial evidence in the record to support its decision to terminate the Plaintiff's LWOP, based on the conclusion that the Plaintiff was not Disabled under the terms of the Life Plan. The Plaintiff disagrees and counters that The Hartford's decision was arbitrary and capricious because: (1) there was no change in conditions to justify the discontinuation of benefits; (2) The Hartford disregarded the fact that it is paying the Plaintiff LTD benefits; (3) it failed to properly consider SSA's disability determination; (4) it failed to examine the Plaintiff; (5) it did not address the effects of the Plaintiff's medications and credit the Plaintiff's consistent reports of symptoms; and (6) it relied on peer-review doctors. On consideration of the parties' briefs, as well as a careful review of the Administrative Record, I find these arguments unavailing and conclude that The Hartford's decision to terminate the Plaintiff's LWOP was not arbitrary and capricious.

## A.    Change in Conditions

The Plaintiff argues that "[a]bsent any evidence of an improvement or change in the nature of [the Plaintiff's] condition, The Hartford abused its discretion under the terms of the [Life] Plan"

by terminating her premium waiver benefits. (ECF No. 34 at 1.) This argument is not persuasive.

The Plaintiff bears the burden of proving by a preponderance of the evidence that she is disabled within the meaning of the plan. *Paese v. Hartford Life and Accident Insurance Co*., 449 F.3d 435, 441 (2d Cir. 2006). "To the extent that Plaintiff argues that the past payment of benefits resulted in a shifting of the burden to the Defendants ... Plaintiff is incorrect. There is nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits." *Fitzpatrick v. Bayer Corp.*, No. 04 Civ 5134, 2008 WL 169318, at *9 (S.D.N.Y. Jan. 17, 2008); *see Butler v. New York Times Co*., No. 03 CIV. 5978 (RCC), 2007 WL 703928, at *4-5 (S.D.N.Y. Mar. 7, 2007)("Plaintiff maintains, in part, that Defendant's denial of benefits is arbitrary and capricious because her condition had not improved subsequent to her ceasing work in April 1998 or receiving approval of benefits in December 1998.... This is not the correct inquiry.... Whether Plaintiff can satisfy [the Plan's definition of disabled] after April 2000-not whether her condition has improved - determines her eligibility for benefits."). In any event, the Plaintiff makes no attempt to show that the record that formed the basis of The Hartford's decision in this case was identical to the record before it when it previously decided to grant premium waiver benefits. To the contrary, in making its March 2017 decision, The Hartford had before it different evidence - a more fully developed and updated record - including assessments by Drs. Conway, Bode, and Kohan, all of whom opined that the Plaintiff was capable of work. *See, e.g., Ramstine v. Hartford Life & Acc. Ins. Co*., No. 3:08CV942, 2010 WL 3718860, at *14 (N.D.N.Y. Sept. 14, 2010)(defendant's decision to terminate waiver of premium benefits was not arbitrary and capricious where it had updated medical information supporting a finding that the Plaintiff's condition had changed since she was awarded waiver of premium benefits).

**B.  LTD benefits**

The Plaintiff next argues that The Hartford's decision is arbitrary because it is incongruous

with its decision that the Plaintiff is eligible for LTD benefits.  (ECF No. 34 at 3.)  In support, the Plaintiff points to The Hartford's 2018 decision reinstating the Plaintiff's LTD benefits.  (AR 99-100; ECF 1 ¶ 31.)

Contrary to the Plaintiff's argument, the definitions of "disabled" in the two plans are not "nearly identical."  (ECF No. 1 ¶ 2.)  To be eligible for LTD, the Plaintiff must be "prevented from performing one or more of the Essential Duties of Any Occupation."  (AR 268.)  "Any Occupation" is defined as an occupation "for which you are qualified by education, training or experience" and has an earnings potential requirement.  (ECF No. 27-2 ("Defendant's 56(a)1 Statement") at ¶¶ 8- 9; ECF No. 34-1 ("Plaintiff's 56(a)2 Statement") at ¶¶ 8-9; AR 268.)

In comparison, with respect to the waiver of life insurance premium benefit, "disabled" under the Life Plan means that the Plaintiff is prevented "from doing any work for which You are or could become qualified by education, training or experience . . . ."  (AR 86.)  It has no minimum earnings potential requirement.  In addition, it does not require full-time work.  "Any work" includes sedentary work on a part-time basis.  (AR 48.)  The definitions in the two policies are different, and the Hartford's conclusion that the Plaintiff was disabled under the LTD plan, which uses a definition the Plaintiff does not dispute is easier to satisfy (ECF 25 -1 at 11), but not disabled under the definition in the Life Plan is not unreasonable.  *See, e.g., Ramstine*, 2010 WL 3718860, at *13 (because the LTD and LWOP policies defined disabled differently, defendant's determination that plaintiff was no longer eligible for waiver of premium benefits despite the fact that she continued to be eligible for LTD benefits was not erroneous).

## C.    SSA benefits

The Plaintiff argues that The Hartford failed to properly consider the SSA's award of disability benefits and that it was arbitrary and capricious for The Hartford to reach a conclusion different from the SSA.

17

The Second Circuit has "encourage[d] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion." *Hobson*, 574 F.3d at 92. "While SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound by the award and is not required to accord that determination any 'special deference.'" *Testa v. Hartford Life Ins. Co.,* 483 Fed. Appx. 595, 598 (2d Cir. 2012) (*quoting Durakovic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 133, 141 (2d Cir. 2010)). *See Ingravallo v. Hartford Life & Acc. Ins. Co.*, 563 Fed. Appx 796, 799 (2d Cir. 2014)("administrators are not bound by an SSA's award of benefits.")

Here, The Hartford considered the SSA's determination and explained to the Plaintiff the different definitions and standards used as well as the difference in medical evidence underlying the two decisions. (AR 49-50.) The SSA determination was made in January 2013 (AR 209-218) – more than 4 years before The Hartford's decision regarding the Plaintiff's LWOP - and did not consider the subsequent medical information, which The Hartford did. Under these circumstances, the SSA award is not determinative, and Hartford's contrary conclusion does not render its decision arbitrary and capricious. *See Wilson v. Hartford & Emblem Health Servs. Co., LLC*, 9 F. Supp. 3d 275, 282 (E.D.N.Y. 2014) (not arbitrary or capricious for defendant to reach a conclusion different from the SSA where the defendant made its decision based on information not available to the SSA); *Rund v. JPMorgan Chase Grp. Long Term Disability Plan*, 855 F. Supp.2d 185, 203 (S.D.N.Y. 2012) (finding that the defendants did not act in an "arbitrary and capricious manner with respect to according weight to the SSA determination" because the defendants "certainly considered the determination of the SSA and explained to the plaintiff the different definitions and standards used"); *VanWright v. First Unum Life Ins. Co*., 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010) ("Ultimately, the question of whether or not a claimant is disabled must be judged according to the terms of the Policy and not according to the SSA's definition.")

**D.**     **Examination**

The Plaintiff next argues that The Hartford "never offered [her] an FCE [functional capacity evaluation] despite her young age and blue collar background." (ECF No. 34 at 9.) But as The Hartford points out, although the Plan provided that it retained the right to conduct such an examination, it was not required to. (AR 1725.)

"[W]here the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled." *Hobson,* 574 F.3d at 91. Here, there was ample evidence from which The Hartford could make a determination as to the Plaintiff's eligibility for LWOP and the Plaintiff does not argue that her medical record was in any respect incomplete. As such, The Hartford was entitled to rely on its independent medical reviewers' opinions regarding the Plaintiff's medical records, as well as the opinion of Dr. Conway, her treating neurologist. *See Shahgholi v. Aetna Inc. Long Term Disability Benefits Plan*, No. 17 CIV. 963, 2018 WL 4177934, at *12 (S.D.N.Y. Aug. 30, 2018) (rejecting plaintiff's argument that the defendant's decision not to request an in-person examination rendered the denial of benefits arbitrary and capricious); *Fitzpatrick*, 2008 WL 169318, at *14 (records review was adequate; no 'in-person, physical examination of [Plaintiff]' was necessary").

**E.**     **Plaintiff's reports of symptoms**

The Plaintiff contends that The Hartford improperly disregarded her descriptions of her disabling conditions and the side effects of her medications. (ECF No. 25 at 9.) Specifically, the Plaintiff points to her complaints contained in her February 2017 appeal as to her poor sleep, pain, and forgetfulness. (AR 110-11.)

Although subjective complaints of disabling conditions are an "important factor to be considered in determining disability," *Miles v. Principal Life Ins. Co*., 720 F.3d 472, 486 (2d Cir.

19

2013), "acceptance of [P]laintiff's subjective complaints [of pain is] . . . by no means required of the administrator." *Kellner v. First Unum Life Ins. Co.*, 589 F.Supp.2d 291, 308 (S.D.N.Y. 2008). *See Maniatty v. UNUM Provident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) (while plaintiff's statements regarding her pain are relevant to her eligibility for benefits, "acceptance of [P]laintiff's subjective complaints [of pain is] ... by no means required of the administrator.")

The Plaintiff's points to *Quigley v. Unum Life Ins. Co. of Am.*, 340 F.Supp.2d 215 (D. Conn. 2004) in support of her argument that it was error not to credit her complaints. The court in *Quigley* held that "Where the record reveals well-documented complaints ... and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Id*. at 224.

The Plaintiff's reliance on *Quigley* is unavailing. First the standard of review was *de novo*. Second, there was no evidence contradicting the plaintiff's reports of disabling pain. By contrast, here there is substantial objective and opinion evidence contradicting the Plaintiff's reports of disabling pain and limitations. *See, e.g.,* AR 179 (Dr. Kohan observing that that there "is no evidence that the claimant experiences any functionally limiting side effects from prescribed medications.) Even her treating neurologist indicated that although she had some functional limitations, she was capable of sedentary work. (AR 181.) On this record, it was not unreasonable for The Hartford not to credit the Plaintiff's complaints of disabling symptoms. *See, e.g.,* *Hightower v. Hartford Life & Acc. Ins. Co.*, No. 3:11CV1619(RNC), 2013 WL 5446127, at *8 (D. Conn. Sept. 30, 2013) (defendant's decision to reject plaintiff's complaints of pain was not arbitrary and capricious where, *inter alia*, plaintiff had had little treatment for his back pain); *Fortune v. Grp. Long Term Disability Plan for Employees of Keyspan Corp.*, 637 F.Supp.2d 132, 143 (E.D.N.Y. 2009) (holding that the administrator "did not abuse its discretion by failing to credit [the plaintiff's] subjective and unsubstantiated complaints of disabling fatigue," where two

physicians found the plaintiff's subjective complaints to be inconsistent with the objective medical evidence), *aff'd*, 391 Fed. Appx 74 (2d Cir. 2010).

## F.    Employment Qualifications

The Plaintiff cursorily argues that she is unable to perform any type of work.  (ECF. 25-1 at 12.)  She contends that "[w]ith approximately five years in a white collar environment, in a low level customer service insurance claim job which ended almost 10 years ago, when she was 25, in which she earned $30,000, she is not qualified for any office work (which she also could not physically and cognitively perform.)"  (ECF 25-1 at 12.)   However, the Plaintiff does not specifically address any of the representative occupations identified in the Employability Analysis. To the extent that she contends that she does not retain the functional capacity to work, she has not shown, in light of the medical evidence, that The Hartford's decision to the contrary was not supported by substantial evidence.

## G.    Peer Review

Finally, the Plaintiff asserts, without more, that The Hartford relied on "self-serving evidence" of peer-review doctors who had "predetermined outcomes."  (ECF No. 34 at 2.)  The Plaintiff has not shown that Drs. Bode and Kohan were biased.  And the mere fact that they were paid consultants does not render The Hartford's decision unreasonable.  In *Hobson*, the Second Circuit dispensed with such an argument, stating that "MetLife did not abuse its discretion by considering these trained physicians' opinions solely because they were selected, and presumably compensated, by Metlife. . . . Indeed, it is customary for plan administrators to do so in evaluating ERISA claims."  574 F.3d at 90; *see Suren v. Metro. Life Ins. Co.*, No. 07CV4439, 2008 WL 4104461, at *11 (E.D.N.Y. Sept. 26, 2008) ("That they were paid consultants does not disable MetLife from considering their opinions in making benefits decisions.").  Further, the Plaintiff's

assertion is undermined by the fact that her own treating neurologist agreed she was capable of sedentary work. (AR 181.)

**V.      CONCLUSION**

For the reasons set forth above, the Plaintiff's motion for summary judgment is denied and The Hartford's motion for summary is granted.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J

Dated:          Hartford, Connecticut
                September 10, 2020